MEG VINCENT, WIFE OF AND LOUIS KEITH VINCENT

VERSUS

NATIONAL GENERAL INSURANCE COMPANY AND DR. FREDRICK DANTAGNAN IV, ON BEHALF OF THE MINOR, JACQUELINE DANTAGNAN

NO. 23-CA-554

FIFTH CIRCUIT

COURT OF APPEAL

STATE OF LOUISIANA

ON APPEAL FROM THE TWENTY-FOURTH JUDICIAL DISTRICT COURT
PARISH OF JEFFERSON, STATE OF LOUISIANA
NO. 782-360, DIVISION "F"
HONORABLE MICHAEL P. MENTZ, JUDGE PRESIDING

October 09, 2024

**SUSAN M. CHEHARDY**
**CHIEF JUDGE**

Panel composed of Judges Susan M. Chehardy,
Marc E. Johnson, and John J. Molaison, Jr.

**AFFIRMED**

**SMC**
**MEJ**
**JJM**

FIFTH CIRCUIT COURT OF APPEAL
A TRUE COPY OF DOCUMENTS AS
SAME APPEARS IN OUR RECORDS

Morgan Naquin
Deputy, Clerk of Court

COUNSEL FOR PLAINTIFF/APPELLANT,
MEG VINCENT
    Vanessa Motta

COUNSEL FOR DEFENDANT/APPELLEE,
HUDSON SPECIALTY INSURANCE COMPANY
    Edwin C. Laizer
    Christopher A. D'Amour
    Kyle L. Potts
    Leigh Ann Tschirn Schell

**CHEHARDY, C.J.**

This appeal arises from an auto accident that occurred in 2017 in which plaintiff, Mrs. Meg Vincent, alleged injuries to her neck, back, and head, including traumatic brain injuries. At a bench trial conducted over the course of eight days, the trial court ruled in favor of Hudson Specialty Insurance Company, the tortfeasor's excess insurer, finding that the damages threshold had not been met in order to trigger coverage under Hudson's umbrella policy. For the reasons that follow, we affirm the trial court's judgment.

*Facts and Procedural History*

On April 16, 2017, a 16-year-old driver turned into the path of Mrs. Vincent's vehicle. Ms. Vincent sued the driver's parent and owner of the vehicle, Dr. Fredrick Dantagnan IV, and his primary and excess insurers, National General Insurance Company and Hudson Specialty Insurance Company, respectively. The matter was initially set for a jury trial. Plaintiffs filed a motion for summary judgment on the issue of liability, which the trial court denied. This Court heart the matter on supervisory review, granted plaintiff's writ application, and reversed the trial court, granting partial summary judgment on liability in plaintiff's favor.[1] *Vincent v. Nat'l Gen'l Ins. Co.*, 21-227 (La. App. 5 Cir. 10/31/21), 330 So.3d 378, 382. Thus, the only issues remaining for trial were causation and damages.

In May 2021, defendant National General settled Mrs. Vincent's claims against it and allegedly sent a letter to the Clerk's Office at the 24th Judicial District Court to withdraw its request for a jury trial. Neither Hudson nor Mrs. Vincent timely sought to reinstate a trial by jury. Faced with a bench trial, Mrs.

---

[1] The original plaintiffs in the lawsuit also included Mrs. Vincent's husband and children, who were pursuing claims for loss of consortium. Before trial, plaintiffs voluntarily dismissed the Vincent family's loss of consortium claims, as well as Ms. Vincent's claims for future lost wages and lost earning capacity. Moreover, the parties stipulated that as an excess insurer, Hudson was entitled to a $500,000 credit due to Ms. Vincent's settlement with National General, defendant's primary insurer.

Vincent filed a motion to recuse the trial judge. The Louisiana Supreme Court appointed an *ad hoc* judge who, after conducting a hearing, denied plaintiff's motion to recuse Judge Mentz. Mrs. Vincent did not seek supervisory review of that ruling. At the time of trial, the only parties remaining in the lawsuit were Mrs. Vincent and Hudson.

The trial judge, acting as fact finder, heard testimony from Mrs. Vincent, Mr. Vincent, and numerous medical professionals. The trial court also reviewed the depositions of physicians and experts that the parties offered as trial testimony. Further, the trial court viewed video surveillance of Mrs. Vincent at Mardi Gras parades in February 2018 and March of 2019 and 2020, which showed her bending, stooping, raising her hands high in the air, climbing a ladder, wearing a full backpack over her shoulders and on her back, and performing other activities without any apparent restrictions.

After considering all the evidence and testimony, the trial court issued a Judgment and Reasons for Judgment in favor of Hudson. In Reasons for Judgment, the trial court found that Mrs. Vincent lacked credibility. The trial court stated that its decision regarding causation was based in part on Ms. Vincent's failure to report her preexisting injuries and conditions to the providers who treated her after the accident, including, among others, Dr. Shamsnia, Dr. Lonseth, and Dr. Bell. The trial court stated:

> Pertinent to this Court's decision is the fact that plaintiff failed to disclose significant information and evidence about her pre-existing medical conditions to her doctors. Dr. Shamsnia was not provided with any records of Ms. Vincent's previous symptoms, complaints, or treatment before her motor vehicle accident. Ms. Vincent did not disclose to Dr. Shamsnia her previous neck and back complaints. She failed to tell Dr. Shamsnia that she had experienced headaches before the accident. She also failed to mention that she had episodes of forgetfulness before the accident and was treated by a psychiatrist before the incident.

The trial court continued:

> Ms. Vincent was also treated following the accident by a neuropsychologist, Dr. Roberta Bell, for emotional and psychological injuries. However, plaintiff refused to give Dr. Bell her medical records of her previous treatment by Dr. Andrea O'Leary. Dr. Bell asked for the records, but the plaintiff never provided them.

In spite of its determination that Mrs. Vincent lacked credibility, the trial court found that the April 2017 accident exacerbated Mrs. Vincent's previous neck injuries, necessitating the two-level cervical fusion surgery that she underwent in September 2017. But the trial court also determined that Ms. Vincent's remaining physical, mental, and emotional conditions preexisted or were unrelated to the accident. The court further determined that Ms. Vincent reached "maximum medical improvement" relative to her cervical injuries and September 2017 fusion surgery by February 2018.

The trial court awarded $130,000 in general damages for Mrs. Vincent's cervical injuries and corresponding surgery. The court also awarded $30,000 for loss of income between September 2017 and February 2018, when it determined she reached maximum recovery. Additional special damages were awarded for the costs of treating Mrs. Vincent's cervical injuries through February 2018, amounting to $112,504.63. Ms. Vincent's total recovery was $272,505.[2] The court did not award any medical expenses for the injuries unrelated to the accident. The

---

[2] The breakdown of the trial court's total award for general and special damages is:

| | | |
|---|---|---|
| General Damages/Pain & Suffering: | | $130,000.00 |
| Loss of Income: | | $ 30,000.00 |
| Special Damages: | | |
| | Dr. Joseph Stagni: | $ 1,068.00 |
| | (9 visits, 4/17/17 to 6/5/17) | |
| | Dr. Michelle LeBlanc | $ 8,268.00 |
| | (23 visits, 6/21/17 to 2/28/18) | |
| | Doctor's Imaging    (5/1/17) | $ 5,990.00 |
| | Diagnostic Imaging | $ 2,645.00 |
| | Injury Meds (through Feb. 2018) | $ 1,271.27 |
| | Dr. Lonseth | $22,250.00 |
| | CVS Pharmacy (Dr. Leichty) | $ 88.88 |
| One Spine Institute, LLC | | $15,673.75 |
| Crescent View Surgery Center | | $55,250.00 |
| TOTAL: | | $272,504.63 |

trial court also determined that where the medical providers' accounts were sold to a medical factoring company[3] in exchange for guaranteed payment, and no evidence was offered to prove that Mrs. Vincent remained legally responsible for the amounts listed on the invoices for One Spine Institute, LLC and Crescent View Surgery Center, only the amount actually paid to the provider, not the amount the provider may have billed, would be awarded.

Notwithstanding the trial court's $272,505 damages award calculation, Ms. Vincent ultimately was not awarded any damages against Hudson, because the award was less than the $500,000 threshold at which Hudson, as excess insurer, would become liable. The court entered judgment in favor of Hudson and ordered each party to bear its own costs. Ms. Vincent now appeals.

*Assignments of Error and Discussion*

Mrs. Vincent raises eight assignments of error on appeal. First, she contends the defendants "stripped" her ability to try this case before a jury, given that National General initially sought a jury trial and posted a jury bond, yet withdrew its jury bond in May 2021 after it settled plaintiff's claims. Mrs. Vincent argues National General did not notify her of this change in status and therefore contends that this case should be remanded for a new trial.

Mrs. Vincent concedes in her appellant's brief that she learned about the revocation of the jury bond no later than October 11, 2021.[4] Nevertheless, counsel for Mrs. Vincent did not file a motion to request or reinstate a jury trial or attempt

---

[3] A medical factoring agreement is typically one in which a factoring company acquires patient accounts receivables from a medical provider, often for a negotiated amount. As part of this transaction, the healthcare provider transfers and assigns its rights to collect the receivables from the patient (and/or any other guarantors) to the factoring company. *See George v. Progressive Waste Solutions of La., Inc.*, 22-1068 (La. 12/9/22), 355 So.3d 583, 585 n.1; *Ochoa v. Aldrete*, 21-632 (La. App. 5 Cir. 12/8/21), 335 So.3d 957, 966.

[4] At this time, Mrs. Vincent was being represented by Todd Comeaux, who enrolled as counsel of record on August 9, 2021. At that time Mr. Comeaux replaced Vanessa Motta, who had represented Mrs. Vincent since the suit was filed. On January 5, 2022, Ms. Motta reenrolled as counsel of record, along with Mr. Comeaux. On May 9, 2023, Mr. Comeaux withdrew from representing Mrs. Vincent.

to post a jury bond before trial began. Instead, counsel for Mrs. Vincent filed a motion to recuse the trial judge. On November 8, 2021, a few days after the ad hoc judge denied Mrs. Vincent's motion to recuse Judge Mentz, Hudson filed an "Unopposed Motion and Order to Set Case for Trial," which stated that the parties agreed that a bench trial was to begin on February 9, 2022.[5] Again, Mrs. Vincent did not object. Finally, Mrs. Vincent did not object at the start of trial to the bench-trial format, nor did she seek review in this Court.[6]

The right to a jury trial in a civil case in a Louisiana court is a statutory as opposed to a constitutional right. *Riddle v. Bickford*, 00-2408 (La. 5/15/01), 785 So.2d 795, 799. La. C.C.P. art. 1733 B provides that a motion to withdraw a demand for a trial by jury "shall be in writing." The pleading demanding a trial by jury shall be filed "not later than ten days after either the service of the last pleading directed to any issue triable by jury, or the granting of a motion to withdraw a demand for a trial by jury." La. C.C.P. art. 1733 C. The courts will indulge every presumption against a waiver, loss, or forfeiture of the right of a litigant to a civil jury trial. *Willeby v. JE Merit Constructors, Inc.*, 04-2421 (La. App. 1 Cir. 6/10/05), 917 So.2d 21, 23.

The record does not indicate that defendant National General, with whom plaintiff settled her claims, filed a written notice to withdraw its request for a jury trial, nor does it appear that National General notified plaintiff that it had done so. Nevertheless, plaintiff concedes that on October 11, 2021, she became aware that the jury bond had been withdrawn. At that time, Mrs. Vincent did not seek to have the jury trial reinstated by subsequently posting bond. *See Cazes v. Ragusa*, 336

---

[5] An earlier "Unopposed Motion and Order to Set Case for Trial", filed on June 8, 2021, set the trial date as November 2, 2021 and indicated that the matter was to be tried before a jury. This trial date was continued for consideration of plaintiff's motion to recuse the trial judge.

[6] At the first day of trial on February 11, 2022, the court indicated that the trial would have to be conducted in a piecemeal fashion, reiterating that it was a bench trial: "We've started the case, the case has been called. We've had exhibits introduced. No jury involved. So this is a bench trial. No efforts by Plaintiff to suggest otherwise." Counsel for Ms. Vincent did not object.

So.2d 904, 906 (La. App. 4th Cir. 1976) (finding the withdrawal of the request for jury trial by the original party seeking and obtaining same must, necessarily, entitle the other parties an opportunity to make a timely request for jury trial).

Mrs. Vincent also did not seek review in this Court of the trial court's purported statement that it was too late to post a jury bond. Finally, Mrs. Vincent did not object when Hudson filed the November 8, 2021 "unopposed motion" to set the case for bench trial or object on the first morning of trial. A litigant in this situation cannot, post-trial, contend that she should have been permitted a trial by jury when she took none of these additional steps, failed to object, and did not seek review in this Court before trial. *See Gaspard v. Horace Mann Ins. Co.*, 17-1140 (La. App. 3 Cir. 5/9/18), 247 So.3d 778, 784, *writ denied*, 18-0897 (La. 9/28/18), 252 So.3d 931 (finding plaintiff waived her right to complain on appeal of the trial court's rescission of its order granting the opportunity to make a cash deposit for a jury trial, and trying the case in a bench trial). Given these facts, we find no merit in Mrs. Vincent's first assignment of error.

In her second assignment of error, Mrs. Vincent contends the ad hoc judge appointed to hear her motion to recuse Judge Mentz erroneously denied the motion. Mrs. Vincent contends that Judge Mentz should be recused not only because he was one of her supervisors when she was employed at the 24th Judicial District Court, but also because Judge Mentz expressed bias against her when he indicated that the medical bill factoring "S-T-I-N-K-S".[7]

---

[7] At the conclusion of the March 11, 2021 hearing, Judge Mentz stated: "Quite frankly I think the whole arrangement [between the third-party factoring company and some of Mrs. Vincent's medical providers] in capital letters STINKS, S-T-I-N-K-S. It stinks. I think there is, potential conflicts, ethical issues involved there. I'm not going to say it's criminal, but it's -- nonetheless, I'm granting the Motions in Limine[.]" This Court granted plaintiff's writ application and reversed that ruling on procedural grounds, determining that neither party offered, filed, and introduced any evidence at the hearing to support the trial court's decision granting the motions in limine. *See Vincent v. National General Ins. Co.*, 21-232 (La. App. 5 Cir. 9/21/21), 2021 WL 4295826 (unreported writ disposition).

At the hearing on the motion to recuse, Judge Ledet asked counsel for Mrs. Vincent about the timing of filing the recusal motion. Counsel explained that he only recently had been brought on as counsel for plaintiff, stating at the recusal hearing: "I didn't think it was an issue until how things have unfolded."[8] Counsel further explained: "I thought I had a jury trial. I wasn't even focusing on this particular [recusal] issue. … We show up here two to three weeks before trial while we are sitting with Judge Mentz in the pre-trial conference the door gets opened on me that … there is no jury bond posted."

Mrs. Vincent also did not offer any evidence at the hearing to show that she had direct interactions with Judge Mentz while she served as Deputy Judicial Administrator at the 24th Judicial District Court in 2014 and 2015. Mrs. Vincent testified only that Judge Mentz was one of the 16 judges to whom she reported, and that he was present during en banc meetings in which her employment was discussed. Judge Ledet asked Mrs. Vincent whether she sought to recuse Judge Sullivan, to whom this case initially was assigned, and who also was one of the judges to whom Mrs. Vincent reported. Mrs. Vincent had not filed a motion to recuse Judge Sullivan.

Following the recusal hearing, Judge Ledet issued a Judgment and Reasons for Judgment denying Mrs. Vincent's motion to recuse Judge Mentz. First, Judge Ledet indicated that Mrs. Vincent's recusal motion was untimely under La. C.C.P. art. 154 A, which requires a litigant to move for recusal "no later than thirty days after discovery of the facts constituting the ground upon which the motion is based." Judge Ledet found that Mrs. Vincent was aware of her employment-related ground for recusal when she filed this lawsuit in 2018 and it was allotted to Judge Sullivan.[9] Judge Ledet also determined that Mrs. Vincent was aware in March

---

[8] *See* footnote 4, *supra*.
[9] The case was subsequently assigned to Judge Klees, pro tem; to Judge Burns, pro tem; to Judge Litchfield; and then to Judge Shayna Beevers Morvant, who voluntarily recused herself based on

2021 of Judge Mentz's remarks from the bench regarding the medical billing/medical factoring issues. Thus, Mrs. Vincent's recusal motion filed in October 2021, two weeks before the scheduled trial, was too late.

Further, Judge Ledet found counsel's argument—that the recusal motion was filed only after counsel learned that there would be a bench trial rather than a jury trial—unpersuasive. Pointing to *Andrade v. Chojnacki*, 338 F3d 448, 462 (5th Cir. 2003), Judge Ledet stated that there are not different recusal standards for a judge trial as opposed to a jury trial, and no such distinction is warranted.

Next, Judge Ledet stated that because there was no indication that Judge Mentz would be called as a witness regarding Mrs. Vincent's previous employment as a Deputy Judicial Administrator at the 24th JDC, there was no basis for Judge Mentz's mandatory recusal under La. C.C.P. art. 151 A(1). Finally, with regard to Judge Mentz's statements at the March 2021 hearing that the practice of factoring medical bills "S-T-I-N-K-S", Judge Ledet stated that a judge is presumed to be impartial, and a party alleging bias must show that the alleged bias, prejudice, or personal interest of the judge is of a substantial nature and based on more than conclusory allegations. La. C.C.P. art. 151 A(4); *Riddle v. Premier Plaza of Monroe, L.L.C.*, 51,173 (La. App. 2 Cir. 2/15/17), 216 So.3d 170, 173-74. Judge Ledet found that these comments were not "extrajudicial" and thus would not warrant recusal, noting that when "the alleged bias or prejudice stems from testimony and evidence presented in the proceedings, the bias or prejudice is not of an extrajudicial nature as would warrant recusal." *Brown v. Brown*, 39,060 (La. App. 2 Cir. 7/21/04), 877 So.2d 1228, 1238.

We review the denial of a motion to recuse for an abuse of discretion. *In re Harrier Trust*, 18-651 (La. App. 3 Cir. 10/17/18), 259 So.3d 488, 495, *writ granted*

---

her previous professional relationship with plaintiff's counsel. Following Judge Morvant's recusal, the case was randomly allotted to Judge Mentz.

*in part on other grounds*, 18-1467 (La. 2/18/19), 263 So.3d 884. A judge is presumed to be impartial. *Frye v. Ballard*, 23-317 (La. 3/14/23), 358 So.3d 36. The party seeking to recuse cannot merely allege lack of impartiality; he must present some factual basis. *Whitehead v. Walmart of Louisiana LLC*, 55,694 (La. App. 2 Cir. 7/3/24), -- So.3d --, 20024 WL 3281403, at *6. The alleged bias or prejudice must be of a substantial nature and based on more than conclusory allegations. *Id.* (citing *Covington v. McNeese Stat Univ.*, 10-250 (La. 4/5/10), 32 So.3d 223). Complaints of adverse rulings alone are insufficient to establish bias to recuse a trial judge. *Lepine v. Lepine*, 17-45 (La. App. 5 Cir. 6/15/17), 223 So.3d 666, 674.

We find no abuse of discretion in the ad hoc judge's ruling denying Mrs. Vincent's motion to recuse Judge Mentz. First, Mrs. Vincent offered no specific, relevant evidence at the recusal hearing to support her contention that Judge Mentz was biased or prejudiced against her. Second, with regard to Judge Mentz's comments about medical factoring at the March 2021 motion hearing, we agree with Judge Ledet's conclusion that these comments arise from testimony and evidence set forth in the proceedings, meaning the comments are not "extrajudicial in nature," and thus are insufficient to merit recusal. *See Augman v. City of Morgan City*, 03-396 (La. App. 1 Cir. 12/31/03), 864 So.2d 248, 249; *Rodock v. Pommier*, 16-809 (La. App. 3 Cir. 2/1/17), 225 So.3d 512, 520, *writ denied*, 17-631 (La. 5/1/17), 221 So.3d 70.

Lastly, Mrs. Vincent's motion to recuse Judge Mentz came too late, per La. C.C.P. art. 151. Accordingly, we find no merit in Mrs. Vincent's second assignment of error. We now turn to the issues of causation and the calculation of damages.

In her fifth and sixth assignments of error, plaintiff contends the trial court erred in finding that the auto accident at issue did not cause the injuries to her back and did not cause traumatic brain injury (TBI) or other damage to her head. In

reasons for judgment, the trial court attributed only the aggravation of Mrs. Vincent's preexisting neck injury, which necessitated the September 2017 two-level anterior cervical fusion at C5-6 and C6-7, to the April 2017 accident.

Hudson argues that the trial court's factual findings should not be disturbed. It contends there is plenty of evidence in the record to support the court's findings, as well as the court's determination that Mrs. Vincent lacked credibility and intentionally kept her prior medical history from her post-accident treating physicians. With regard to her alleged head injuries, Hudson argues that Mrs. Vincent dismissed her loss-of-earnings claims, acknowledging her post-accident ability to earn $80,000 per year, which undermines her claim that she suffers from diminished cognitive function. As for Mrs. Vincent's alleged back injuries, Hudson points out that Dr. Redillas, a neurologist, recognized Mrs. Vincent's history of pre-existing headaches, her treatment with Dr. Melcher in 2014 for migraines, and her treatment in 2015 for seizures and fainting in addition to headaches.

The trial court reached its factual conclusions based on its analysis of the extensive record evidence of Mrs. Vincent's substantial pre-existing history of physical pain resulting in treatment with chiropractors and neurologists, as well as mental and emotional health issues that necessitated treatment with social workers and a psychiatrist. In addition, the trial court determined that Mrs. Vincent did not give a full account of her pre-accident conditions to several of the medical providers who treated her after the April 2017 accident.

In a personal injury suit, the plaintiff bears the burden of proving the existence of the injury as well as the connection between the injury sustained and the accident that caused the injury. *Lewis v. State Through Dep't of Transp. & Dev.*, 94-2370 (La. 4/21/95), 654 So.2d, 311, 313. In a bench trial, the trial court acts as the finder of fact. The appropriate standard for appellate review of factual determinations is the manifest error standard, which precludes the setting aside of a

trial court's factual findings unless they are clearly wrong in light of the record viewed in its entirety. *Reyes v. Clasing*, 13-791 (La. App. 5 Cir. 3/12/14), 138 So.3d 61, 64. To reverse a fact finder's determination on the basis of manifest error, a two-part test must be satisfied: 1) the appellate court must find from the record that a reasonable factual basis does not exist for the finding of the trial court, and 2) the appellate court must also determine that the record establishes that the finding is clearly wrong. *Id.* (citing *Lambert v. Ray Brandt Dodge, Inc.*, 09-739 (La. App. 5 Cir. 1/26/10), 31 So.3d 1108, 1112). The issue before the appellate court is not whether the trier of fact was right or wrong, but whether the factfinder's conclusion was a reasonable one. *Jones v. Mkt. Basket Stores, Inc.*, 22-841 (La. 3/17/23), 359 So.3d 452, 463. The appellate court may not merely decide whether it would have found the facts of the case differently and substitute its opinion for the trial court's determination, because the trial court is in a unique position to see and hear the witnesses as they testify. *Reyes*, 138 So.3d at 64 (citing *Evans v. State Farm Mut. Auto. Ins. Co.*, 03-1003 (La. App. 5 Cir. 12/30/03), 865 So.2d 195, 197). Where there is a conflict in testimony, reasonable determinations of credibility and reasonable inferences of fact should not be disturbed on appeal. *Id.* Where the fact finder's determination is based on its decision to credit the testimony of one of two or more witnesses, the finding can virtually never be manifestly erroneous; this rule applies equally to the evaluation of expert testimony, including the evaluation and resolution of conflicts in expert testimony. *Jones*, 359 So.3d at 463 (citing *Snider v. La. Medical Mutual Ins. Co.*, 14-1964 (La. 5/5/15), 169 So.3d 319, 323).

Prior to the April 2017 accident, Ms. Vincent treated with chiropractors, neurologists, a psychiatrist, a psychologist, and other medical professionals. Mrs. Vincent testified at trial that she began treatment for lower back pain in 2002 with Dr. Mark Kruse, a chiropractor. She stated that in those days she would usually

only require one treatment, and she would return for additional treatment only when there was a new issue. Mrs. Vincent also described a May 2003 auto accident in which her vehicle rolled over, which contributed to her lower back pain. In 2007, she stated that she was diagnosed with Ehlers-Danlos Syndrome, a connective tissue disorder characterized by overly flexible joints, which causes pain and discomfort. Also in 2007, Ms. Vincent reported to Dr. Kruse that her back pain was affecting her neck. In 2008, Dr. Kruse recommended that she see a neurologist. She again reported back and neck pain in 2012 and received treatment from another chiropractor, Dr. Stagni. Dr. Stagni treated her for pain and numbness in her back, neck, and hip, and for tingling in her arms. Dr. Stagni continued treating Mrs. Vincent sporadically up until a few weeks before the April 2017 auto accident.

In November 2014, Dr. Archie Melcher, a neurologist, diagnosed Mrs. Vincent with anxiety, depression, back and neck pain, poor memory, and vision disturbance. Ms. Vincent also treated with Maria Crumley, a social worker, for anxiety and stress in 2016. Dr. Andrea O'Leary, a psychiatrist, treated Ms. Vincent before the accident and prescribed medication for Post-Traumatic Stress Disorder, Attention Deficit/Hyperactivity Disorder, and Anxiety Disorder. Ms. Vincent reported to Dr. O'Leary in November 2016 that she was experiencing forgetfulness, poor organization, poor credit history, and problems focusing on work.

Ms. Vincent testified that immediately after the April 2017 accident, she had a headache and took some ibuprofen, then went to the adoration chapel at her church but did not stay very long, because, she testified, she was starting to feel a lot of pain – headaches, body aches, and feeling "airy" and like she was spinning. The next day she saw her chiropractor, Dr. Stagni. She stated that she felt confused

and as though something was not right. Dr. Stagni recommended that she get an MRI of her head, which was performed on May 1, 2017.

Mrs. Vincent's attorney also referred her to Dr. Peter Liechty, a neurosurgeon, who saw Mrs. Vincent for the first time on June 23, 2017. Dr. Liechty testified that her chief complaint at that time was neck pain, jaw pain, headaches, and shoulder pain. According to Dr. Liechty, "she had no significant health issues or significant history concerning her cervical spine. She had only minimal spine issues that were treated by a chiropractor a few times a year. She was asymptomatic prior to [the April 2017 accident]." He initially prescribed cervical epidural steroid injections to attempt to decrease the inflammation in her spinal canal, as well as anti-inflammatory medication. When she failed to improve, he recommended the two-level cervical discectomy and fusion. At a subsequent visit, Dr. Liechty found that she had some lumbar disc issues as well, but he found the cervical issue more pressing. After the surgery, Dr. Liechty restricted Mrs. Vincent's work duties for six months to allow for proper healing.

On January 26, 2018, Mrs. Vincent complained of back pain. Dr. Liechty increased her pain medication and ordered a lumbar epidural steroid injection. Dr. Liechty's subsequent office visits with Mrs. Vincent indicated that she was continuing to struggle with back and neck pain, although he found that she did well with the lumbar steroid injection. At a December 22, 2019 visit, Dr. Liechty found that she "has been struggling with some low back pain despite excellent pain management. Her issues persist. Here for followup. Neurologically well on exam." Dr. Liechty found that she "has focal pathology at the L4-5 disc and has failed maximum conservative care. She would be a good candidate for minimally invasive L4-5 fusion." The December 2019 visit was Mrs. Vincent's last visit with Dr. Liechty. Dr. Liechty testified that he believed it was more probable than not

that the April 2017 accident aggravated or exacerbated both her cervical pain and her low-back/lumbar pain.

Mrs. Vincent also treated with Dr. Eric Lonseth, an anesthesiologist and pain management doctor; Dr. Michelle Leblanc, another chiropractor; and with Dr. Roberta Bell, a neuropsychologist, for alleged cognitive and mental and emotional issues.

In extensive Reasons for Judgment dated April 24, 2023, the trial court explained its reasons for determining why Mrs. Vincent's head and back injuries were not related to the 2017 accident:

> The Court finds that plaintiff's symptoms, complaints, and extensive treatment for her back complaints, headaches, depression, and cognitive injuries are not causally related to the accident of April 17, 2017. Plaintiff's ongoing complaints are simply not consistent with the evidence reflecting her actual physical capabilities. Further, Ms. Vincent has a lengthy and complex medical history prior to the 2017 accident. As the medical records, testimony and evidence establish, Ms. Vincent was being treated for her emotional condition and physical condition (especially her neck and back complaints related to Ehlers-Danlos syndrome) prior to the 2017 accident. Immediately following the accident, Ms. Vincent was conscious, alert, and responsive. She testified that she went to check on the driver of the other vehicle. She had specific recall of the events immediately following the impact. She spoke to the other driver, Jacqueline Dantagnan. She called and spoke to the mother of Ms. Dantagnan and tried calming the young driver. The actions of Ms. Vincent were corroborated by Ms. Dantagnan. She testified that Ms. Vincent told her at the scene that she was fine. She spent approximately one hour with Ms. Vincent at the scene during which time Ms. Vincent was alert, responsive and showed no indication that she had sustained injuries. Ms. Vincent also continued her employment following the accident without incident until her surgery in September 2017.

> The court finds the testimony and opinions of Dr. Donald Adams and Dr. Kevin Greve persuasive, compelling, and adopts their opinions.

> Ms. Vincent had an MRI performed at Doctor's Imaging on May 1, 2017. The exam was performed at the request of Ms. Vincent's chiropractor, Joseph Stagni. Notwithstanding Ms.

Vincent's allegations that her MRI was abnormal, the results of the test states [sic]: "No evidence of significant hippocampal asymmetry. The Volumetric Examination is within normal limits." Dr. Adams verified the MRI was normal and does not support any traumatic injury to her brain.

Ms. Vincent did not sustain a traumatic brain injury in the April 17, 2017 accident. Dr. Adams, a neurologist who specializes in brain injuries, opined that there is no reason to believe that Ms. Vincent's headaches are related to the accident or that her emotional and cognitive issues are related to post-concussive syndrome. Dr. Kevin Greve, a neuropshycologist, determined that Ms. Vincent's depression, anxiety, and emotional symptoms are a result of personality factors and stressors that pre-date her accident and are not related to the accident in question in this litigation.

Pertinent to this Court's decision is the fact that plaintiff failed to disclose significant information and evidence about her pre-existing medical conditions to her doctors. Dr. Shamsnia was not provided with any records of Ms. Vincent's previous symptoms, complaints, or treatment before her motor vehicle accident. Ms. Vincent did not disclose to Dr. Shamsnia her previous neck and back complaints. She failed to tell Dr. Shamsnia that she had experienced headaches before the accident. She also failed to mention that she had episodes of forgetfulness before the accident and was treated by a psychiatrist before the incident.

When Ms. Vincent went to Dr. Eric Lonseth for treatment, she failed to disclose her prior neck and back treatment. Ms. Vincent was also treated following the accident by a neuropsychologist, Dr. Roberta Bell, for emotional and psychological injuries. However, plaintiff refused to give Dr. Bell her medical records of her previous treatment by Dr. Andrea O'Leary. Dr. Bell asked for the records, but the plaintiff never provided them.

In January 2016, over a year before the accident involved in this litigation, Ms. Vincent began treating with Dr. O'Leary. She … related mood issues, suicidal thoughts, anxiety and depression. Her history included a physically and verbally abusive first marriage. She also related her diagnosis of Ehlers-Danlos syndrome. Dr. O'Leary diagnosed her with Post-Traumatic Stress Disorder, Attention-Deficit/Hyperactivity Disorder and Anxiety Disorder.

In November 2016, several months before her accident, Ms. Vincent related to Dr. O'Leary the following symptoms: forgetfulness, poor organization, losing personal things;

problems with organizing the house, car, purse; poor credit history; and difficulty focusing on work. She related that her parents helped her with forgetfulness. She was being prescribed Cymbalta, Alprazolam, Trazadone, and Adderall. Ms. Vincent was still seeking treatment with Dr. O'Leary for these symptoms on April 5, 2017, less than two weeks before the accident.

Ms. Vincent complained of the identical symptoms following the accident and has tried to relate her condition(s) to the accident. There's an obvious reason that Ms. Vincent did not want Dr. Bell to have access to her pre-existing history.

Finally, during Ms. Vincent's testimony on direct examination she stated that because of the accident she was unable to be physically active in the same manner that she was in years past. Following confrontation with the surveillance video, Ms. Vincent then stated that she could physically do everything after the accident that she could do before.

In February 2020, while the plaintiff continued significant treatment for neck and back complaints, evidence introduced at the trial by way of video surveillance reflects Ms. Vincent dancing in the street at a Mardi Gras parade, bending over at the waist without restriction or limitation; bouncing, stooping, twisting her head from side to side without restriction, wearing a full back pack over her shoulders and on her back and standing for extended periods of time.

In disputing the trial court's findings that her back injuries were unrelated to the accident, Mrs. Vincent points to testimony from her chiropractors, Drs. Stagni and LeBlanc, as well as Drs. Liechty, Lonseth, Shamsnia, and Todd, who testified that her back injuries more likely than not were caused by the April 2017 accident. She argues the trial court erred in refusing to credit the testimony of her treating physicians and instead giving credence to the testimony of defendant's experts, who were hired strictly for this litigation.

On the other hand, Hudson reiterates that Mrs. Vincent did not tell Dr. Shamsnia and other medical providers about her past treatments, did not provide her past medical records or history, did not reveal prior neck and back complaints or her history of previous headaches, and did not indicate that she had experienced

previous episodes of forgetfulness and psychiatric treatment. Mrs. Vincent also did not provide her neuropsychologist, Dr. Roberta Bell, with her records of past treatment with Dr. O'Leary, her psychiatrist, even though Dr. Bell requested them.

After our thorough review of the record, we cannot say the trial court manifestly erred in determining: 1) the auto accident at issue exacerbated only plaintiff's neck-related injuries, which led to her cervical surgery a few months later, but 2) the accident was not the cause of plaintiff's complaints related to her alleged back injuries or her alleged head injuries. The record contains ample evidence and expert testimony to support the trial court's factual findings. Although numerous physicians and experts testified regarding Mrs. Vincent's back pain and purported head injuries, such as post-concussive disorder, and also indicated that these maladies were related to the accident, the record supports the trial court's determination that many of the physicians who treated Mrs. Vincent after the accident did not have the full benefit of Mrs. Vincent's pre-accident medical history.

For example, Dr. Shamsnia, a neurologist, testified that although he was aware of the MRI ordered in 2014 by Dr. Melcher in connection with her migraines, Mrs. Vincent did not tell him she had a history of headaches before the accident; she did not tell Dr. Shamsnia about treatment for numbness in her hands and joint pain before the accident; did not tell him about her 2003 vehicular accident that caused neck and back pain; and did not tell him that she was treated by a psychiatrist, Dr. O'Leary, for PTSD, ADHD, and anxiety.

Dr. Roberta Bell, a neuropsychologist, saw Mrs. Vincent only one time, in January 2018. The only records she had in relation to Mrs. Vincent's medical treatment before the accident was from South Shore Medical Associates in 2015. Although Dr. Bell knew Mrs. Vincent had treated with Dr. O'Leary, Dr. Bell did not have those records and did not know about the diagnoses of PTSD, ADHD, or

Anxiety Disorder. Dr. Bell testified that she asked counsel for Mrs. Vincent for past treatment records but they were never provided. Dr. Bell had none of the psychiatrist or counselor records before preparing her report. Dr. Bell stated that Mrs. Vincent did not have PTSD or ADHD when she saw her, and Dr. Bell disagreed with Dr. O'Leary's diagnosis, but Dr. Bell agreed that Mrs. Vincent was positive for anxiety and major depressive disorder.

Additionally, the October 3, 2018 summary from Maria Crumley, LCSW, states: "Ms. Meg Vincent has been seen individually in psychotherapy on a weekly basis between 4/1/17 [two weeks before the accident] to present. … Throughout this reporting period, Ms. Vincent has complained of frequent headaches that are moderate to severe in intensity as well as difficulty with short term memory and concentration. The onset of these seems seem to have followed a car accident which occurred in April 2017 and have resulted in Ms. Vincent at times feeling more overwhelmed and having greater difficulty keeping up with the demands of managing a household as well as caring for the needs of her four children." But in his expert report, Dr. Donald Adams states: "It is not accurate that, as observed by her therapist, Dr. Crumley, in her summary of October 3, 2018, that Ms. Vincent's difficulties with short-term memory and concentration followed the car accident that occurred in April 2017."

Our role in reviewing the trial court's factual findings is not to re-weigh the evidence, unless we first determine that the trial court's findings are manifestly erroneous because the record contains *no* support for its conclusions. As the record shows, the experts do not all agree about Mrs. Vincent's pre- and post-accident diagnoses, nor do they all agree about the cause of Mrs. Vincent's back and head injuries, but where the record provides some support for the trial court's factual conclusions, we cannot say the trial court manifestly erred.

We also cannot say the trial court manifestly erred in finding Mrs. Vincent's complaints of having much more serious headaches after the accident to lack credibility, given the extensive evidence that Mrs. Vincent had suffered from headaches off and on for many years. The trial court also noted that Mrs. Vincent was able to hold a job and that she was making more money than she made before the accident. The trial court accordingly concluded that the April 2017 accident did not cause any traumatic brain injury, rejecting the opinions of those expert who testified that the she suffered a brain injury and experienced post-concussive disorder as a result of the accident. In reaching that conclusion, the trial court relied on the testimony and the February 7, 2020 expert report from Dr. Donald Adams, who is board certified in psychiatry and neurology. Dr. Adams' report states:

> An MRI scan of the brain was obtained on May 1, fourteen days after this accident. In this timeframe a standard MRI would have been very sensitive to any acute change in brain structure. The basic MRI scan of Ms. Vincent's brain is normal. A "tiny focus of abnormal subcortical white matter signal" was identified. The interpreting radiologist described this as "nonspecific". Recent studies have shown that 53% of healthy, uninjured individuals age 44-48 will have deep white matter hyperintensities similar to those seen on Ms. Vincent's scan (Wen 2004). … These hyperintensities are also much more common in individuals with migraine headaches. Ms. Vincent has a well-documented history of complex migraines (Melcher 2014). This normal scan is consistent with the definition of MTBI.

Dr. Adams' report further explained that the severity of the brain injury roughly correlates with the duration of any alteration in consciousness. Dr. Adams found that there was no definite evidence that Mrs. Vincent suffered any significant alteration in consciousness as a result of the accident, but even if he were to assume that she had a brief period of "altered consciousness," it was very brief and there was no posttraumatic amnesia. He stated that in cases of mild traumatic brain injury (MTBI), such as a concussion, there is progressive recovery

in cognitive function, not decline, and a rapid return to premorbid functional status is anticipated. Dr. Adams found: "Based on the information in her medical records, there is no reason to think that Ms. Vincent whould [sic] be an exception to this anticipated pattern of recovery. Rapid and progressive improvement and return to her baseline status would have been anticipated. The fact that she could return to work after one day and continue to work for five months indicates that this occurred."

Dr. Adams further noted that Mrs. Vincent's treating physicians "do not discuss the fact that her recovery and current situation, including her apparent memory impairments, do not conform to the expected recovery, nor did they account for her significant comorbidities of depression and PTSD." Dr. Adams' report further stated: "Not only is there no objective evidence of problems thinking clearly, we also know that Ms. Vincent's current complaints appear similar to her complaints to her psychiatrist 5 months prior to her accident. She was also diagnosed as having PTSD from at least March 2016, over a year prior to the accident in question." Dr. Adams indicated that the presence of post-concussion symptoms "cannot be used to infer that Ms. Vincent's problems are a result of the physical consequences of the injury of April 2017. There is a much better reason to believe that these are related to her long-standing problems with PTSD." Finally, Dr. Adams believed that Mrs. Vincent's current neurologists who have diagnosed post-concussion syndrome and who attribute it to her April 2017 accident "do not discuss the effect of PTSD and other psychological conditions on this group of symptoms …. From their records it does not appear that they were aware of the prior diagnosis of PTSD or of the extent of this woman's prior psychological difficulties."[10] Dr. Adams noted Mrs. Vincent's prior history and complaints of

---

[10] Dr. Adams opined: "Some of the uncertainties in prior assessments of this matter may stem from the fact that Meg Vincent has stated that she did not have problems thinking clearly or substantial problems psychologically prior to the accident of April 16 [2017]. The records from

difficulty with cognitive function, her diagnosis of ADHD in 2015, her forgetfulness or poor organizational skills as documented in Dr. O'Leary's progress notes of November 2016, and poor memory as noted by Dr. Melcher in 2014. Dr. Adams concluded in his report: "There is no basis for attributing her current complaints of problems with thinking clearly to the physical effects of the concussion that occurred in April 2017."

After testing her in April 2019, Dr. Kevin Greve, a neuropsychologist, also stated that "there is no objective psychometric evidence of any cognitive impairment beyond some inefficient verbal learning. Her subjective cognitive complaints are most likely related to emotional factors." Dr. Greve did not believe that Ms. Vincent sustained a brain injury in the accident.

Even if we may have decided these issues differently had we been the finder of fact, our role is not to reconsider all the evidence; it is rather to determine whether the trial court manifestly erred. In the present case, we find no manifest error relative to the trial court's determination as to causation. As such, we will not disturb the trial court's conclusion that Mrs. Vincent's head and back injuries are not related to the April 2017 accident. Accordingly, Mrs. Vincent's fifth and sixth assignments of error are without merit.

In her fourth assignment of error, Mrs. Vincent argues the trial court abused its discretion by awarding only $130,000 in general damages for the injuries that required her to undergo a two-level cervical fusion in her neck. An appellate court must consider relevant prior general damage awards as guidance in determining whether a trier of fact's award is an abuse of discretion. *Pete v. Boland Marine &*

---

her obstetricians, Drs. Kennedy and St. Germain, however, indicate that she had been receiving counseling for an extended period of time and had seen 2 psychiatrists previously, beginning in the 1990's. In addition, although she was consistently diagnosed by her psychiatrist, Dr. O'Leary, as suffering from PTSD since at least March 2016, 13 months prior to this accident, it does not appear that this was known to her more recent treating clinicians and there is no evidence that this was considered in the assessment of the case."

*Mfg. Co., LLC*, 23-170 (La. 10/20/23), 379 So.3d 636, 639. General damages are those that may not be fixed with pecuniary exactitude; instead, they involve mental or physical pain or suffering, inconvenience, the loss of intellectual gratification or physical enjoyment, or other losses of life or lifestyle that cannot be definitely measured in monetary terms. *Jones v. Market Basket Stores, Inc.*, 359 So.3d at 464.

In support of its award, the trial court cited, among other cases, *Fontana v. Louisiana Sheriff's Auto Risk*, 96-1579 (La. App. 1 Cir. 6/20/97), 697 So.2d 1030, 697 So.2d 1030, *writ denied*, 97-2363 (La 1/9/98), 705 So.2d 1088.[11] In *Fontana*, the plaintiff was diagnosed with a cervical strain and left shoulder contusion after a January 1993 auto accident. The plaintiff returned to light-duty work with the Terrebonne Parish Sheriff's Office a few weeks after the accident, continuing with conservative treatment. On November 17, 1993, after continuing to experience pain, severe headaches, and a positive discogram, he underwent a two-level anterior cervical discectomy and fusion. Although he initially experienced relief, two additional unrelated incidents caused plaintiff to experience additional pain. With regard to the plaintiff's accident-related injuries, the jury awarded the plaintiff $100,000 for pain, suffering, and mental anguish. The court of appeal affirmed that award.

Mrs. Vincent contends the cases upon which the trial court relied are outdated or are not sufficiently analogous to her own situation. She argues that this Court should consider *Jackson v. Underwriters at Lloyd's of London*, 21-15 (La. App. 5 Cir. 9/29/21), 329 So.3d 1029, 1046, *writ denied*, 21-1591 (La. 1/12/22), 330 So.3d 617, which awarded $275,000 in general damages. In *Jackson*, the plaintiff experienced pain in her shoulders, neck, upper back, arms, and numbness

---

[11] The trial court also cited *Cormier v. Republic Ins.Co.*, 11-632 (La. App. 3 Cir. 1/18/12), 118 So.3d 16; *Jackson v. CSX Transport Inc.*, 97-109 (La. App. 4 Cir. 12/23/97), 712 So.2d 514; and *Eubanks v. Salmon*, 99-425 (La. App. 5 Cir. 2/16/00), 780 So.2d 517.

in her hands after an auto accident. An MRI showed disc herniation and nerve root impingement at multiple levels in her spine. After multiple injections and treatment for pain management, the plaintiff's neurosurgeon recommended an anterior cervical discectomy fusion at C3-4 and C4-5, and testified that a second surgery may be needed at C7-T1. However, the $275,000 general damages award in *Jackson* was further broken down into both past and future general damages: $150,000 for past pain, suffering, and mental anguish, and $50,000 for past loss of enjoyment of life; $50,000 for future pain, suffering, and mental anguish, and $25,000 for future loss of enjoyment of life.

Here, in contrast to *Jackson*, the trial court found that Mrs. Vincent reached maximum recovery in February 2018 and did not award future medical expenses. Thus, the trial court's award for "General Damages/Pain & Suffering" does not appear to include *future* general damages. Stated differently, we find the trial court's $130,000 award for "Pain & Suffering" in this case is not out of line with the $150,000 award in *Jackson v. Underwriters* for past pain, suffering, and mental anguish.

Other cases involving plaintiffs with injuries similar to Mrs. Vincent's cervical injuries have awarded $150,000 for pain and suffering. For example, in *Fontenot v. UV Ins. Risk Retention Group, Inc.*, 20-361 (La. App. 3 Cir. 4/14/21), 359 So.3d 36, *writ denied*, 21-656 (La. 10/5/21), 325 So.3d 357, the court of appeal raised the general damages awarded for past, present, and future pain and suffering to the lowest reasonable amount, which it found was $150,000, for a plaintiff who was rear-ended by a tractor-trailer, and who underwent a three-level cervical discectomy and fusion with the possibility of an additional future surgery. In *Huntley v. 21st Century Premier Ins. Co.*, 16-514 (La. App. 3 Cir. 11/2/16), 204 So.3d 1085, 1087, *writ denied*, 17-148 (La. 3/13/17), 216 So.3d 803, the court of appeal affirmed the jury's award of $150,000.00 for past, present, and future pain

and suffering based on a cervical fusion performed after the accident, as well as evidence presented at trial that a future lumbar surgery may be necessary. And in *Kelley v. General Ins. Co. of America*, 14-180 (La. App. 1 Cir. 12/23/14), 168 So.3d 528, *writ denied*, 15-157 (La. 4/10/15) 163 So.3d 814, and *writ denied*, 15-165 (La. 4/10/15) 163 So.3d 816, the plaintiff underwent a two-level cervical fusion, but evidence at trial showed the plaintiff had pre-existing back and neck injuries that necessitated an earlier surgery. The court of appeal determined that the $150,000.00 general damage award for past physical pain and suffering was not abusively low, where the jury evidently did not believe that all of the plaintiff's medical expenses were causally connected to the incident in question.

Lastly, in *Venissat v. St. Paul Fire & Marine Ins. Co.*, 06-987 (La. App. 3 Cir. 8/5/07), 968 So.2d 1063, a 68-year-old plaintiff was rear-ended by a deputy's patrol car, which caused overall body soreness and pain in his neck and shoulders. The plaintiff underwent a cervical discectomy and fusion at three levels. The plaintiff took approximately a year to recover, though he was left with a limited range of motion in his neck. The jury awarded only $25,000 in general damages for pain and suffering. On appeal, the Third Circuit noted that the plaintiff had developed chronic pain and radiculopathy from the accident, which was relieved only after the surgery, approximately two years after the accident. The appellate court amended the $25,000 award for pain and suffering by raising it to the lowest reasonable amount, which it determined was $60,000. The court of appeal affirmed the loss of enjoyment of life ($5,000) and mental anguish ($10,000) awards, resulting in a total general damage award of $75,000.

Here, Mrs. Vincent worked up until the day before her surgery, and the trial court determined that she recovered from her accident-related neck injuries no later than six months after that surgery. Based on our review of similar cases and in

light of the record before us, we cannot say that the trial court abused its discretion in awarding $130,000 in general damages to Mrs. Vincent.

In her seventh assignment of error, Mrs. Vincent contends the trial court erred in awarding her only $30,000 for past wages, or approximately five months of her pre-accident earnings of approximately $71,000 per year. She contends that she missed 18 months of work after her cervical surgery and that the trial court should have awarded $109,482.62, through April 2, 2020.

Again, Mrs. Vincent worked up until the day before her surgery in September 2017. She testified at trial that in December 2017, she began a weight-loss program called Optavia, and soon thereafter began working for Optavia through referrals. During 2018 and 2019, she had obtained between 15 or 20 clients for Optavia. At trial, Mrs. Vincent admitted that she received residuals from Optavia for 2018 and 2019. Mrs. Vincent also worked, in a referral capacity, for a company called Restorix, but she was let go from that company in January or February 2018. She also stated that she was not looking for work in early 2018 because her treating physicians felt she was not ready for traditional employment at that time.

Surveillance video revealed Mrs. Vincent's physical capabilities at Mardi Gras in February 2018, suggesting that she was capable of returning to work by that time. Mrs. Vincent herself testified that she could do everything after the accident that she could do before the accident. Finally, Mrs. Vincent testified that at the time of trial, she was earning approximately $80,000 per year. Based on the record evidence, and with appropriate deference to the trial court's discretion, we see no reason to disturb the award for past lost wages.

In her eighth assignment of error, Mrs. Vincent argues that the trial court erred in failing to award plaintiff any *future* medical expenses. Plaintiff points to the testimony of Dr. Liechty, who indicated that a recent MRI showed that her C4-

5 level was already failing and that she may need additional cervical surgery. Dr. Todd, the defendant's IME doctor, also testified that he could not rule out that Mrs. Vincent would suffer from adjacent disc disease as a result of her surgery. Mrs. Vincent claims that, pursuant to a report from Dr. Stokes, she should have been awarded between $110,385.20 and $175,734.01 for future cervical surgery.[12]

We previously found no error in the trial court's determination that only Mrs. Vincent's neck injuries were exacerbated by the accident, not her alleged back and head injuries, nor was there any error in the trial court's finding that Mrs. Vincent recovered from her exacerbated neck injuries no later than February 2018. As such, we find no error in the trial court's determination that future medical expenses related to the accident were not warranted.

Finally, we address Mrs. Vincent's third assignment of error, in which she contends the trial court committed legal error in refusing to award "full medical expenses" where the record demonstrates that she has proven those expenses by a preponderance of the evidence. *See Gunn v. Robertson*, 01-347 (La. App. 5 Cir. 11/14/01), 801 So.2d 555, 564, *writs denied*, 02-170, 02-176 (La. 3/22/02), 811 So.2d 942. This argument arises from the satisfaction of Mrs. Vincent's medical expenses by a third-party factoring company, Medport LA, LLC.

Here, Medport paid both Dr. Liechty, who performed Mrs. Vincent's cervical fusion (and who bills through "One Spine Institute, LLC"), and Crescent View Surgery Center, the facility at which her procedure was performed, a substantially discounted rate in exchange for an assignment of their rights against the plaintiff to collect the invoiced amount. Mrs. Vincent argues she should be awarded the "full" invoiced amount for her cervical treatment. She contends that in failing to do so, the trial court ignored the binding precedent of *George v.*

---

[12] Mrs. Vincent also contends that a future lumbar surgery would cost between $158,000 and $201,000.

*Progressive Waste Solutions of LA, Inc.*, 22-1068 (La. 12/9/22), 355 So.3d 583, in which the Supreme Court determined that a defendant is not entitled to benefit from any reduction in the sale of medical bills from a medical provider to a medical factoring company. Mrs. Vincent further argues that the trial court erred when it relied on evidence not properly introduced into the record to form its decision regarding the reasonableness of the medical expenses that it did award.

Dr. Liechty treated Mrs. Vincent from June 2017 through December 2019. Dr. Liechty's office visits totaled $11,050.00, and his surgical fee was $50,698.50, all of which were billed through One Spine. Thus, the total amount Mrs. Vincent claims she is owed for One Spine's services related to her cervical injury and surgery is $61,748.50. Mrs. Vincent also presented a bill from Crescent View Surgery Center for $145,900.00.

The trial court declined to award the total damages claimed. As the trial court correctly recognized, the present facts are distinguishable from *George*, *supra*, and *Ochoa v. Aldrete*, 21-632 (La. App. 5 Cir. 12/8/21), 335 So.3d 957. In *George*, the defendant filed a motion in limine seeking to exclude the medical provider's bills as irrelevant and inadmissible, arguing there was no evidence that the plaintiff remained personally responsible to the factoring company for payments. But in *George*, the parties produced evidence of both an agreement between the medical provider and the factoring company, and a letter of guaranty from the plaintiff's counsel stating that counsel would protect the interest, assignments, and privileges of the factoring company. The Louisiana Supreme Court stated: "The limited record in this matter contains no indicia that plaintiff has been released of his original obligation." *George*, 355 So.3d at 588. The Court noted that the plaintiff was not a party to the agreement between the medical provider and the factoring company, and thus there was "no indication that the plaintiff was released from any obligation to pay the medical bill as charged."

Likewise, counsel's letter of guaranty "evidences no intent to release plaintiff from any obligation related to the charges for his medical services." *Id.* The Supreme Court further indicated that there had been no allegation of "inflated charges" by the medical providers. The Court opined that deciding to disallow evidence of the full-billed charges before trial "could result in a jury award that would make plaintiff less than whole." *Id.* at 588 n.8.

Likewise, in *Ochoa*, when addressing a motion in limine to exclude medical bills on supervisory review, this Court determined: "the provisions and terms of the Assignment Agreements are unambiguous regarding Mr. Ochoa's responsibility to pay the total amount billed by his medical providers. … Mr. Ochoa remains liable to [the factoring company] for the full amount of the billed medical invoices for treatment received[.]" 335 So.3d at 966. This Court therefore vacated the trial court's judgment granting the motion in limine and remanded to the trial court for further proceedings.

In contrast to the pre-trial posture in *George* and *Ochoa*, this case has been to trial, but no evidence of a contract between Mrs. Vincent and One Spine/Dr. Liechty was offered at trial. Indeed, Dr. Liechty testified in his February 1, 2022 trial deposition that he had never seen a subrogation or lien contract signed by Mrs. Vincent. The trial court therefore determined that Mrs. Vincent did not meet the definition of "Qualifying Patient" as defined in the August 1, 2017 Master Service Agreement between One Spine and Medport that was attached to Dr. Liechty's trial deposition. Section 1.9 (b) of the Master Service Agreement states that a "'Qualifying Patient' means a patient: (b) Who executed a Subrogation Contract (defined below) and, when necessary, a Letter of Protection, with and/or in favor of Provider[.]" As the trial court determined:

> For Ms. Vincent to be a qualified patient, she needed to have
> signed a Subrogation Contract. She did not. Alternatively, it
> required that the patient could not be covered by a federal

program or insurance. If covered by insurance, the patient needed to choose not to submit the bill to the insurer. Ms. Vincent was covered by medical insurance, CIGNA. Additionally, she testified that she was never given the choice to use her insurance. No one at One Spine discussed with her or gave her the option to use her insurance. In the testimony of Stephanie Danielson, she confirmed that Dr. Liechty made the decision as to how the services would be billed.

Without a subrogation contract signed by Mrs. Vincent or a letter of guaranty signed by counsel for Mrs. Vincent, there is no record evidence to indicate that Mrs. Vincent remains personally responsible to One Spine/Dr. Liechty for the full invoiced amount.

Although Mrs. Vincent evidently signed a subrogation agreement with Crescent View Surgery Center, no evidence was offered at trial to show the relationship between Crescent View and Medport. In fact, the trial court pointed out that "Total Medical Concepts" was the third-party factoring company initially responsible for Ms. Vincent's surgery charge at Crescent View. Yet no evidence was introduced at trial to show that Crescent View had transferred its receivable to Total Medical Concepts, nor was there any evidence introduced to show that Total Medical Concepts had transferred the receivable to Medport. Finally, there is no letter of guaranty from Mrs. Vincent's counsel in Medport's favor.

Finding no evidence to show that Mrs. Vincent remained responsible for any outstanding charges to either One Spine/Dr. Liechty or to Crescent View, the trial court calculated a reasonable amount for these services. For Dr. Liechty's/One Spine's total services, the trial court determined a reasonable amount to be what One Spine accepted as payment from Medport through February 2018, when plaintiff reached maximum recovery, or $15,673.75.

As for Crescent View Surgical Center, the trial court similarly found that Crescent View agreed with Medport in advance to accept $55,250.00 for Mrs. Vincent's surgery, which the court determined was fair and reasonable for the

service that Crescent View provided. The testimony of Stephanie Danielson, the business administrator at Crescent View who oversaw billing and collections at the time, confirmed that Crescent View accepted approximately $55,000 for that surgery and that it wrote off the remaining balance.[13]

We disagree with Mrs. Vincent argument that the trial court's failure to award "the full amount of her medical expenses" constitutes legal error. Again, the record shows only that: (i) Mrs. Vincent did not know how the services that Dr. Liechty and Crescent View provided were being paid; (ii) the possibility of submitting the medical bills from these providers to her health insurer was not discussed; (iii) if Mrs. Vincent signed a subrogation agreement with Dr. Liechty/One Spine, none was offered into evidence, although the agreement between One Spine and Medport, which requires such a subrogation agreement with the "qualifying patient", is in evidence; (iv) although Mrs. Vincent signed a subrogation agreement with Crescent View, there is no evidence of an assignment agreement between Crescent View and Total Medical Concepts or between Total Medical Concepts and Medport; (v) both Dr. Liechty/One Spine and Crescent View have indicated that Mrs. Vincent's accounts with them have been settled. Given these factors, we cannot say the trial court abused its discretion when

---

[13] Ms. Danielson testified in her October 10, 2022 trial deposition:

> Q: … Crescent View was paid a little over $55,000 on a supposed charge here of 145,900; correct?
> A: Correct.
> Q: All right. And so all that Crescent View got paid for it, was the 55,280 [sic]; correct?
> A: Correct.
> Q: Okay. Once you're paid – or once Crescent View is paid, the balance to the Surgery Center is zero; correct?
> A: Correct.
> Q: And – and Mrs. Vincent doesn't owe anything to Crescent View Surgery Center?
> A: Correct.

awarding special damages for these providers in the amounts that they accepted from Medport in satisfaction of the debt incurred.[14]

CONCLUSION

Finding no manifest error in the trial court's factual findings and no abuse of discretion either in the trial court's calculation of general and special damages or in the denial of Mrs. Vincent's motion to recuse the trial judge, the judgment in favor of Hudson Specialty Insurance Company is affirmed.

**AFFIRMED**

---

[14] Given the unique circumstances in this case, even if we were to disagree with the trial court's method of determining special damages in conjunction with the serviced provided by One Spine/Dr. Liechty and Crescent View Surgery Center for Mrs. Vincent's cervical injuries, awarding the additional damages that Mrs. Vincent seeks for these providers would be insufficient to propel her total damages award above the $500,000 threshold needed to trigger Hudson's umbrella policy. Awarding the total amount that Mrs. Vincent seeks for Dr. Liechty's/One Spine Institute's bill would add $46,074.75, and awarding the total amount that she seeks for Crescent View Surgery Center's bill would add $90,650.00, resulting in additional special damages of $136,724.75. An additional award of $136,724.75 would increase Mrs. Vincent's total damages award to $409,229.38, which remains below the $500,000 threshold.

SUSAN M. CHEHARDY
CHIEF JUDGE

FREDERICKA H. WICKER
JUDE G. GRAVOIS
MARC E. JOHNSON
STEPHEN J. WINDHORST
JOHN J. MOLAISON, JR.
SCOTT U. SCHLEGEL
TIMOTHY S. MARCEL

JUDGES

CURTIS B. PURSELL
CLERK OF COURT

SUSAN S. BUCHHOLZ
CHIEF DEPUTY CLERK

LINDA M. WISEMAN
FIRST DEPUTY CLERK

MELISSA C. LEDET
DIRECTOR OF CENTRAL STAFF

(504) 376-1400
(504) 376-1498 FAX



FIFTH CIRCUIT

101 DERBIGNY STREET (70053)

POST OFFICE BOX 489

GRETNA, LOUISIANA 70054

www.fifthcircuit.org

## NOTICE OF JUDGMENT AND CERTIFICATE OF DELIVERY

I CERTIFY THAT A COPY OF THE OPINION IN THE BELOW-NUMBERED MATTER HAS BEEN DELIVERED
IN ACCORDANCE WITH **UNIFORM RULES - COURT OF APPEAL, RULE 2-16.4 AND 2-16.5** THIS DAY
**OCTOBER 9, 2024** TO THE TRIAL JUDGE, CLERK OF COURT, COUNSEL OF RECORD AND ALL PARTIES
NOT REPRESENTED BY COUNSEL, AS LISTED BELOW:

**CURTIS B. PURSELL**
CLERK OF COURT

## 23-CA-554

**E-NOTIFIED**
24TH JUDICIAL DISTRICT COURT (CLERK)
HONORABLE MICHAEL P. MENTZ (DISTRICT JUDGE)
VANESSA MOTTA (APPELLANT)          TODD C. COMEAUX (APPELLEE)          KYLE L. POTTS (APPELLEE)
LEIGH ANN TSCHIRN SCHELL (APPELLEE)

**MAILED**
CHRISTOPHER A. D'AMOUR (APPELLEE)
EDWIN C. LAIZER (APPELLEE)
ATTORNEYS AT LAW
701 POYDRAS STREET
SUITE 4500
NEW ORLEANS, LA 70139